IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DAVALOUS JAMON BROWN,

       Plaintiff,

vs.                                   No. CIV 17-0944 JB/JHR

CITY OF LAS CRUCES POLICE
DEPARTMENT, CITY OF, DOÑA ANA
COUNTY SHERIFF DEPARTMENT;
DOÑA ANA COUNTY DETENTION
CENTER; CHASE DUVANELL; BRAD
LUNSFORD; ENRIQUE KIKI VIGIL;
JAIME MONTOYA; KENNETH DANIEL
GALLEGOS MIYAGISHIMA and CHRIS
BARELA,

       Defendants.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDATION

    This matter is before the Court on *Plaintiff's Motion for Pretrial Conference and Telephonic Hearings; Scheduling Order and Case Management*, filed on December 21, 2018 [Doc. 28]; *Defendants' First Motion for Summary Judgment Based Upon Heck v. Humphrey and Qualified Immunity*, filed on January 15, 2019 [Doc. 33]; *Defendants' Second Motion for Summary Judgment on Plaintiff's Claims Under State Law*, filed on January 15, 2019 [Doc. 34]; *Defendants' Motion to Stay Proceedings Pending Resolution of Motion for Summary Judgment Based Upon Qualified Immunity,* filed on January 15, 2019 [Doc. 35]; and *Defendants' Motion to Strike Plaintiff's Surreply*, filed on April 29, 2019 [Doc. 45]. On September 17, 2018, pursuant to 28 U.S.C. § 636(b)(1)(B) and (b)(3), United States District Judge James O. Browning referred the case to United States Magistrate Judge Jerry H. Ritter "to conduct hearings, if warranted, including

evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case." [Doc. 2].

Having carefully considered the parties' submissions and the relevant law, and for the reasons outlined below, I recommend that summary judgment be granted against Plaintiff's claims directed toward Defendants Lunsford, Montoya, and Miyagishima and that Plaintiff's remaining claims against Defendants Montoya, Barela, and the Las Cruces Police Department be dismissed.

## I.  FACTUAL BACKGROUND[1]

On July 11, 2014, Xavia Gutierrez, the mother of Plaintiff's children reported that she and Plaintiff were involved in a domestic dispute at her residence in Las Cruces, New Mexico. [Doc. 33-7, pp. 3-5]. In her statement to LCPD officers, Ms. Gutierrez said that when she arrived home on July 11, 2014, Plaintiff approached her wanting to talk about their relationship. [Doc. 33-7, p. 3]. When Ms. Gutierrez asked him to leave, Plaintiff reached into the driver's side of her vehicle, where she was sitting, grabbed her by the throat and pushed her into the passenger seat. [*Id.*, p. 4]. Plaintiff drove around the area, continuing to hold Ms. Gutierrez by the throat. [*Id.*]. He refused to let her out of the vehicle and held her by her legs when she attempted to get out. [*Id.*]. Plaintiff drove Ms. Gutierrez back to her residence and exited the vehicle. [*Id.*]. Ms. Gutierrez called 911 and requested assistance. [*Id.*]. She was then able to regain control of her vehicle and get away. [*Id.*]. As she attempted to pull away from her residence, Plaintiff jumped on the hood of her car and threatened to kill her. [*Id.*]. Ms. Gutierrez managed to drive away. [*Id.*]. She and stopped at nearby convenience store and called 911 again. [*Id.*]. Officer Renteria of the LCPD responded to Ms. Gutierrez' residence where a male matching Plaintiff's description fled on foot, ignoring the

<hr>

[1] On the record currently before the Court, the facts in this section are undisputed, except as noted. For purposes of summary judgment, Plaintiff's verified Complaint is treated as a sworn affidavit. *See Dawson v. Archambeau*, 763 F. App'x 667, 671 (10th Cir. 2019).

officer's directions to stop. [*Id.*]. Officer J. Roman of the LCPD responded to the convenience store where he took Ms. Gutierrez' statement and noted that it was supported by physical evidence on both Ms. Gutierrez' person and vehicle. [*Id.*]. As a result of the incident, Plaintiff was charged with battery against a household member; criminal damage to property; and resisting, evading, or obstructing an officer. [Doc. 33-2, p. 1; Doc. 33-7, p. 1]. A warrant was issued for Plaintiff's arrest. [*Id.*].

On the morning of July 12, 2014, at Ms. Gutierrez' suggestion, Plaintiff went to Ms. Gutierrez' residence. [Doc. 1-1, p. 3]. While Plaintiff was using Ms. Gutierrez' shower, she contacted Deputy Thouvenell of the LCPD, who arrived at the residence to arrest Plaintiff, pursuant to the warrant. [Doc. 1-1, p. 3-4].[2] Plaintiff was still in the shower when Deputy Thouvenell arrived at the residence and entered the bathroom with his Taser pointed at Plaintiff. [Doc. 1-1, p, 4]. Plaintiff exited the shower, took control of the Taser, fled the residence unclothed, and hid under a nearby mobile home. [Doc. 1-1, p. 4]. As Plaintiff was fleeing, shots were fired. [Doc. 1-1, p. 4; Doc. 33-3, p. 2].

Officer Brad Lunsford of the LCPD was dispatched to provide back up to the Sheriff's Deputies on scene. [Doc 33-3, p. 2]. As he was on his way to the scene, Officer Lunsford heard over his radio that shots had been fired, but it was not clear who had fired the shots. [*Id.*]. Officer Lunsford noticed Sheriff's Deputies moving quickly around a trailer in the area. [*Id.*]. He then observed Plaintiff fleeing. [*Id.*]. Plaintiff jumped over two fences and did not respond to Officer Lunsford's commands to stop. [*Id.*].

---

[2] In his Complaint, Plaintiff incorrectly identified Deputy Thouvenell as Deputy Chase Duvanell. [Doc. 1-1, pp. 2-5, 11]. This Court noted the error in its May 7, 2018, Memorandum Opinion and Order and directed the Clerk of the Court to correct the case caption to reflect the proper spelling of Deputy Thouvenell's last name. [Doc. 18].

Deputy Thouvenell approached Officer Lunsford and advised him that the fleeing man had battered a peace officer and instructed Officer Lunsford to shoot the man. [Doc. 1-1, p. 4; Doc. 33-3, p. 2]. Deputy Thouvenell and Officer Lunsford both fired at Plaintiff as he continued to flee. [Doc. 1-1, p. 5; Doc. 33-3, p. 2]. Plaintiff's lower right calf was struck by a bullet. [Doc. 1-1, p. 5]. Plaintiff continued to flee from the police and eventually reentered Ms. Gutierrez' residence and barricaded himself inside. [Doc. 1-1, p. 5; Doc. 33-3, p. 2]. Officer Lunsford was relieved by another officer and was not involved in any subsequent efforts to apprehend or arrest Plaintiff. [Doc. 1-1, pp. 2-5; Doc. 33, p. 4].

The LCPD SWAT team arrived at Ms. Gutierrez' residence. [Doc. 33-4, p. 3]. Officers repeatedly instructed Plaintiff to exit the residence, but Plaintiff remained inside. [*Id.*]. An Avatar SWAT robot was placed into the residence through an open window. [*Id.*]. Plaintiff threw the robot out of the residence. [*Id.*]. Officers introduced "less-than lethal" chemical agents into the residence and placed the robot back inside. [Doc. 1-1, p. 5; Doc. 33-4, p. 3]. Through the robot's monitor, officers were able to observe images of Plaintiff running through the residence with a knife and what appeared to be "some kind of a bludgeoning object" that looked like the leg of a table. [Doc. 33-4, pp. 3-4].

The SWAT team entered the residence with a police service dog. [Doc. 1-1, p. 6; Doc. 33-4, p. 4]. Plaintiff was cornered in the bathroom of the residence. [*Id.*]. A physical confrontation ensued between Plaintiff, the police service dog, and at least one LCPD officer. [Doc. 1-1, p. 6; Doc. 33-4, pp. 4-5]. Plaintiff was taken into custody and transported to the University Medical Center in El Paso where he was treated for the gunshot wound to his calf and dog bites. [Doc. 1-1, p. 6; Doc. 33-4, p. 5; Doc. 35-5, pp. 2-3].

Plaintiff was subsequently indicted on charges of battery against a household member, use of a telephone to threaten, harass or offend, aggravated battery, disarming a peace officer, aggravated assault of a peace officer; battery on a peace officer, resisting or obstructing, abuse or interference with a police animal, and kidnapping. [Doc. 33-6, pp. 1-5]. A jury found Plaintiff guilty of one count of false imprisonment, one count of battery against a household member; one count of use of a telephone to threaten, harass, annoy, or offend, two counts of battery on a peace officer; and one count of resisting, evading, or obstructing an officer. [Doc. 33-10, pp. 1-4; Doc. 33-11, pp. 1-5]. Plaintiff was sentenced to nine years and one hundred eighty days of confinement in the custody of the New Mexico Corrections Department. [Doc. 33-10, pp. 1-4; Doc. 33-11, pp. 1-5].

## II.     PROCEDURAL BACKGROUND

On August 9, 2017, Plaintiff filed his Complaint against the LCPD, the Doña Ana County Sheriff's Department, the Doña Ana County Detention Center, Deputy Thouvenell, Officer Lunsford, Doña Ana County Sheriff Enrique "Kiki" Vigil, Chief of the LCPD, Jaime Montoya, Mayor of Las Cruces, Kenneth Daniel Gallegos Miyagishima, and Doña Ana County Detention Center administrator, Chris Barela in the First Judicial District Court of New Mexico in the County of Santa Fe. [Doc. 1-1, pp. 1-2].

Based on Plaintiff's allegations, the Court has discerned claims that appear to be raised by the Complaint under the Constitution of the United States of America, the Constitution of New Mexico, and the New Mexico Tort Claims Act ("NMTCA"), NMSA 1978, §§ 41-4-1 to -30 (1976, as amended through 2015), to wit: "(i) false arrest and false imprisonment; (ii) malicious prosecution (iii) excessive force; and (iv) failure to provide adequate and necessary medical care."

[Doc. 18, p. 5]. The Complaint seeks compensatory damages in the amount of $400,000.00, and "exemplary and punitive damages." [Doc. 1-1, p. 13].

On May 7, 2018, the Court dismissed Plaintiff's federal constitutional claims against the LCPD, the Doña Ana County Sheriff Department and the Doña Ana County Detention Center as not cognizable under 42 U.S.C. § 1983 (2012). [Doc. 18, pp. 15, 24]. Subsequently, on October 29, 2018, the Court granted a joint motion to dismiss the remaining claims against the Doña Ana County Sheriff Department and the Doña Ana County Detention Center, as well as all claims against Deputy Thouvenell pursuant to a settlement agreement between the parties.[3] [Doc. 26; Doc. 27].

On January 15, 2019, Defendants Lunsford, Montoya, and Miyagishima (collectively Defendants) moved for summary judgment on Plaintiff's federal constitutional claims against them [Doc. 33] and on Plaintiff's claims against them under the NMTCA [Doc. 34]. Defendants also moved to stay proceedings pending the Court's ruling on the motion for summary judgment on Plaintiff's federal constitutional claims. [Doc. 35]. Plaintiff did not timely respond to the motions and on February 15, 2019, notices of completion of briefing were filed. [Doc. 36; Doc. 37; Doc. 38]. On March 11, 2019, Plaintiff filed what appears to be a response to both motions for summary judgment as well as the motion to stay, along with a motion for an extension of time to respond. [Doc. 39].

---

[3] The motion and order of dismissal was ambiguous as to whether Defendant Vigil was included in the settlement agreement between Plaintiff and the Doña Ana County Defendants such that he should be dismissed with the Doña Ana County Defendants. On July 26, 2019, I requested clarification from the parties regarding Defendant Vigil's status and directed the parties to respond in writing within ten days. Based on the parties' responses, it appears that Defendant Vigil was included in the settlement agreement and was intended to be included in the dismissal of the Doña Ana County Defendants.

On March 25, 2019, Defendants filed a Reply in support of their motions for summary judgment and motion to stay. [Doc. 40]. Without leave of the Court Plaintiff filed a surresponse on April 8, 2019. [4] [Doc. 44]. On April 29, 2019, Lunsford, Montoya, and Miyagishima moved to strike the surresponse. [Doc. 45]. Subsequently, on May 20, 2019, Plaintiff filed a response that appears to address both summary judgment motions, the motion to stay, and the motion to strike. [Doc. 46].

## III. <u>ANALYSIS</u>

**Dismissal of Defendants Montoya and Barela**

**Defendant Montoya**

On January 15, 2019, Defendants filed a Suggestion of Death, giving notice that Defendant Montoya passed away on January 3, 2019. [Doc. 32]. Federal Rule of Civil Procedure 25(a) (1) provides that if a party dies during the pendency of litigation, "and the claim is not extinguished, the court may order substitution of the proper party." Fed. R. Civ. P. 25. "A motion for substitution may be made by any party or by the decedent's successor or representative." *Id.* However, if "the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent *must* be dismissed." *Id.* (emphasis added). As an excess of 90 days has passed since the Suggestion of Death was filed and no motion for substitution of party has been made, it is recommended that Plaintiff's claims against Defendant Montoya be dismissed.

**Defendant Barela**

In its May 7, 2018 Memorandum Opinion and Order, the Court noted that Defendant Barela had not "entered an appearance even though the state court issued a summons." [Doc. 18, p. 24].

---

[4] Although Plaintiff's filing is styled *Plaintiff's reply to defendants response to deny summary judgment and Request for extention* [sic] *of time Also plaintiffs Amended Response to defendants qualified Immunity motion* [Doc. 44], I construes it as a surreply, as it contains Plaintiff's responses to the arguments made in the reply filed by Lunsford, Montoya and Miyagishima in support of their pending motions [Doc. 40].

At that point, it was not clear from the record whether the summons was returned executed, because the Defendants had not filed a complete copy of the state court record. [*Id.*, pp. 24-25]. As a result, the Court ordered Defendants to file a complete copy of the state court record and a status update informing the Court of the status of service of process on Barela within thirty days of the entry, of the Court's Order. [*Id.*, p. 25].

In their status update, filed May 9, 2018, Defendants' advised the Court that the Return of Service filed in the state court action indicates that service was attempted on Barela through the Dona Ana County Detention Center by the United States Postal Service via certified, return receipt mail on August 28, 2017. [Doc. 20]. According to Defendants, Barela was on indefinite administrative leave as of July 14, 2017 and resigned on August 20, 2017. [*Id.*]. Defendants' counsel could not say with certainty whether Barela was ever served with a copy of the Complaint. [*Id.*].

On July 23, 2018, Plaintiff filed a *Motion to Show Cause and for Extension of Time to Serve and Show Process of Service on Defendant* [Doc. 25], in which he detailed his efforts to locate and serve Barela up to that date and requested additional time in which to do so. On January 3, 2019, I granted Plaintiff's request for an extension of time locate Barela, giving him 30 days from the entry of the Order to provide Barela's current address. [Doc. 31]. The Order cautioned Plaintiff that a failure to timely comply would result in dismissal of all claims against Barela. [*Id.*]. An excess of 90 days has passed since the Order granting Plaintiff's request for an extension was filed and Plaintiff has not provided an address for Barela. Therefore, I recommend that all claims against Barela be dismissed.

**Plaintiff's Untimely Responses and Request for Extension of Time**

Defendants' first and second motions for summary judgment and motion to stay were filed January 15, 2019. [Doc. 33; Doc. 34; Doc. 35]. Plaintiff's responses to those motions were due January 29, 2019. *See* D.N.M.LR-Civ. 7.4(a) ("A response must be served and filed within fourteen (14) calendar days after service of the motion."). Plaintiff filed a single response to Defendants' first and second motions for summary judgment and motion to stay on March 11, 2019 — approximately six weeks after the expiration of the January 29, 2019 deadline. [Doc. 39]; *see* D.N.M.LR-Civ. 7.4(a).

Plaintiff's initial March 11, 2019 response included a general request for "a 90 day extention [sic] of time to help the remainder of the court proceedings to run smoothly without delay." [Doc. 39, pp. 2-3]. Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure provides that where a party moves for an extension after the original deadline has expired, the Court may extend the time "for good cause…if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). It is not clear whether Plaintiff is requesting that the Court excuse the late filing of his initial response or to permit him additional time in which to file a supplemental response.[5] Either way, Plaintiff's request is unavailing, as he has not offered any explanation or alluded to any excusable neglect to which his untimely responses can be attributed. [*See generally* Doc. 39]. Fed. R. Civ. P. 6(b)(1)(B).

Accordingly, I recommend that the Court disregard Plaintiff's untimely responses to Defendants' first and second motions for summary judgment and motion to stay [Doc. 39; Doc. 46]. *See Ogden v. San Juan County,* 32 F.3d 452, 455 (10th Cir.1994) (recognizing that while the

---

[5] This question arises because Plaintiff did in fact file a supplemental response on May 20, 2019, approximately 70 days after the initial response was filed. [Doc. 46].

Court will liberally construe a pro-se litigant's filings, "pro-se status does not excuse the obligation of any litigant to comply with the fundamental requirements of the Federal Rules of Civil and Appellate Procedure.").

**Defendants' Motion to Strike Plaintiff's Surreply**

After Plaintiff's initial untimely response to Defendants' first and second motions for summary judgment and motion to stay, Defendants filed their reply in support of all three motions on March 25, 2019. [Doc. 40]. Plaintiff then filed *Plaintiffs reply to defendants response to deny Summary Judgment and Request for extention* [sic] *of time. Also Plaintiffs Amended Response to defendants qualified Immunity motion* [Doc. 44]. Defendants' filed a motion to strike Plaintiff's filing, characterizing it as a surreply impermissibly filed without leave of the Court. [*See generally* Doc. 45]. Because this filing appears to directly address Defendants' reply in support of their first motion for summary judgment, it is more appropriately construed as a surresponse than a surreply. *Compare Black's Law Dictionary* 1674 (10th ed. 2014) (defining "surresponse" as "[a] second response by someone who opposes a motion" and noting that "[a] surresponse (rarely allowed) comes in answer to the movant's reply."), *with id.* at 1673 (defining "surreply" as "[a] movant's second supplemental response to another party's opposition to a motion, usually in answer to a surresponse.")

While local rule 7.4(b) provides that "[t]he filing of a surreply requires leave of the Court," the local rules are silent as to whether leave is also required prior to filing a surresponse. D.N.M.L.R.-Civ. 7.4(b). "However the terms have been used interchangeably." *Ramos v. Foam Am., Inc.*, No. CV 15-980, 2018 WL 987243, at *3 (D.N.M. Feb. 20, 2018) (citing *Walker v. THI of New Mexico at Hobbs Ctr.*, 2011 WL 2728344, at *1 (D.N.M. 2011)). Nonetheless, "both local rules and local custom authorize only three pleadings to be filed: the motion, the response, and the

reply." *Tellez-Giron v. Conn's Appliances, Inc.*, No. 1:17-CV-01074, 2018 WL 611361, at *4 (D.N.M. Jan. 29, 2018); *see* D.N.M.L.R.-Civ. 7.4.

Courts typically permit supplemental pleadings such a surresponse or surreply "where the reply presents new arguments or new evidence." *Tellez-Giron*, No. 1:17-CV-01074, 2018 WL 611361, at *4; *see Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990); *Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 2012 WL 1132527, at *15 (D.N.M. 2012). Here, Defendants' reply in support of their first motion for summary judgment does not contain new arguments or evidence. [*See generally* Doc. 45]. Rather, the reply addresses the untimeliness and sufficiency of Plaintiff's initial response. [*See id.*]. Therefore, I recommend that Defendants' motion to strike be granted.[6]

**Defendants' Motions for Summary Judgment**

**The Law Regarding Summary Judgment**

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999); Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable jury could return a

---

[6] While it is recommended that Plaintiff's untimely filings be disregarded and/or stricken, I note that even if the Court were to consider them, Plaintiff's argument in opposition to summary judgment is unavailing. The exhibits provided in opposition to summary judgment include portions of Plaintiff's Complaint, portions of Defendants' reply in support of summary judgment, portions of the New Mexico Court of Appeals' decision on Plaintiff's state court appeal, what appears to be part of an evidence log, and what appears to be a portion of Deputy Thouvenell's report from the initial domestic disturbance call. [Doc. 46, pp.-24]. These exhibits do not include any material facts not already in the record. [*See id.*]. The only argument Plaintiff makes in opposing summary judgment is that qualified immunity is not an adequate defense to his § 1983 excessive force claim. [*See generally* Doc. 39 (including no new argument or assertions of fact); Doc. 44, pp. 2-3; Doc. 46, p. 10]. In this regard, Plaintiff argues that qualified immunity is not appropriate because the show of force by LCPD officers was objectively unreasonable. [Doc. 44, pp. 2-3; Doc. 46, p. 10]. For the reasons set forth below, I am persuaded that the opposite is true.

verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). If the movant carries this initial burden, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671. If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to him. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Summary judgment may not be based solely on the nonmovant's failure to timely respond. *See Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002) ("If the evidence produced in support of the summary judgment motion does not meet this burden, summary judgment must be denied *even if no opposing evidentiary matter is presented.* If the nonmoving party fails to respond, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law. If it has not, summary judgment is not appropriate, for [n]o defense to an insufficient showing is required." (alteration and emphasis in the original) (internal quotation marks and citation omitted)).

"Although a nonmoving party may not rely merely on the unsupported or conclusory allegations contained in his pleadings, a verified complaint may be treated as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56[ ]." *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988).

**Defendants' First Motion for Summary Judgment**

In their First Motion for Summary Judgment Defendants Lunsford, Montoya and Miyagishima argue that summary judgment is appropriate on Plaintiff's claims under § 1983 because those claims are barred under the United States Supreme Court decision, *Heck v. Humphrey*, 512 U.S. 477 (1994) and because Defendants are entitled to qualified immunity. [Doc. 33, pp. 8-27].

***Humphrey v. Heck***

In *Heck*, the Court considered whether claims which call into question the lawfulness of a prisoner's conviction or confinement are cognizable under § 1983. *See Heck*, 512 U.S. at 483. In that case, a prisoner proceeding pro se brought claims under § 1983 against a state police investigator and county prosecutors alleging that they, acting under color of state law, "had engaged in an unlawful, unreasonable, and arbitrary investigation leading to [the] petitioner's arrest; knowingly destroyed evidence which was exculpatory in nature and could have proved [the] [petitioner's] innocence; and caused an illegal and unlawful voice identification procedure to be used at [the] petitioner's trial." *Id.* at 479 (third alteration in original) (internal quotation marks omitted). "The complaint sought, among other things, compensatory and punitive monetary damages," but did not seek injunctive relief or release from custody. *Id.*

The Court determined that the petitioner's claim in that case was analogous to the common law action for malicious prosecution, and constituted an impermissible collateral attack on his

conviction. *Id.* at 484. The Court explained that the principle "that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement, just as it has always applied to actions for malicious prosecution." *Id.* at 486. Accordingly, the Court held that such claims were not cognizable under § 1983. *Id.* at 486-87 ("We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.").

"Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." *Id.* at 487. "[I]f it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* "But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id.*

In the present case, Defendants argue that Plaintiff's false arrest/false imprisonment and malicious prosecution claims fall within the type of claims barred under *Heck*. [Doc. 33, pp. 8-27]. To succeed on false arrest/false imprisonment and malicious prosecution claims, a § 1983 plaintiff must demonstrate the lack of probable cause to support his arrest and/or detention. *See Wilkins v.*

*DeReyes*, 528 F.3d 790, 798 (10th Cir. 2008) ("[A] Fourth–Amendment malicious-prosecution case…deals…with the probable cause determination during the institution of legal process."); *see Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1207-08 (10th Cir. 2006) ("Under New Mexico law, false imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so…[A] common-law defense to a civil wrongful arrest or a false imprisonment suit also requires only that the officer prove that he or she acted in good faith and with probable cause and therefore lawfully under the circumstances ") (internal quotation marks and citation omitted)). Thus, both false arrest/false imprisonment and malicious prosecution claims implicate the constitutionality of a plaintiff's arrest and/or detention and are therefore barred under *Heck*. *See Heck*, 512 U.S. at 486-87. Accordingly, I recommend that summary judgment be granted on Plaintiff's § 1983 claims for false imprisonment/false arrest and malicious prosecution.

**Section 1983 and Qualified Immunity**

Section 1983 states in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. To establish a claim under § 1983, a plaintiff must prove that a defendant acted under color of state law to deprive the plaintiff of a right, privilege, or immunity secured by the Constitution or the laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988).

Qualified immunity is a defense that shields "governmental officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Patel v. Hall*, 849 F.3d at 980 (citing *Mullenix*, 136 S.Ct. at 308).

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). First, "[t]he plaintiff must demonstrate on the facts alleged ... that the defendant violated [her] constitutional or statutory rights." *Id.* The Court will "ordinarily accept the plaintiff's version of the facts," although it does not do so if that version "is blatantly contradicted by the record, so that no reasonable jury could believe it." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (internal quotation marks omitted), *cert. denied*, *657 —— U.S. ——, 139 S.Ct. 1347, —— L.Ed.2d —— (2019). Second, the plaintiff must show "that the right was clearly established at the time of the alleged unlawful activity." *Riggins*, 572 F.3d at 1107.

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (internal quotation marks omitted). In other words, "[f]ailure on either qualified immunity element is fatal to the plaintiff's cause." *Kerns v. Bader*, 663 F.3d at 1180; *see e.g.*, *Torres v. Madrid*, 769 F. App'x 654, 656-57 (10th Cir. 2019) (affirming the entry of summary judgment on the plaintiff's § 1983 excessive force claim where there was no genuine issue of material fact as to the alleged constitutional violation). As explained below, Plaintiff's claims fail under the first prong of the qualified-immunity analysis.

**Plaintiff's Claims Against Lunsford**

**Excessive Use of Force**

Claims of excessive force under § 1983 fall within the Fourth Amendment. *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008) (An excessive force claim is treated as a seizure subject to the Fourth Amendment's reasonableness requirement.). The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. "The Fourth Amendment covers only 'searches and seizures.'" *City of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998).

Here, Plaintiff makes no allegation implicating an unreasonable search. Thus, the question is whether Plaintiff was seized within the meaning of the Fourth Amendment. To prove an excessive force claim under the Fourth Amendment, Plaintiff must prove that the force used to effect a seizure was objectively unreasonable under the totality of the circumstances. *Estate of Larsen*, 511 F.3d at 1259. To prevail, Plaintiff first "'must show...that a 'seizure' occurred....'" *Childress v. City of Arapaho*, 210 F.3d 1154, 1156 (10th Cir. 2000) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989). A seizure requires the "intentional acquisition of physical control" of the person being seized. *Childress*, 210 F.3d at 1156. "[W]ithout a seizure, there can be no claim for excessive use of force." *Jones v. Norton*, 809 F.3d 564, 575 (10th Cir. 2015).

Accordingly, unsuccessful attempts by law enforcement officers to seize a suspect, either through physical force or through a show of authority, do not constitute seizures as defined under the Fourth Amendment. *See Lewis,* 523 U.S. at 845 n. 7 ("Attempted seizures of a person are beyond the scope of the Fourth Amendment."); *United States v. Beamon,* 576 F.App'x. 753, 757-58 (10th Cir.2014) (unpublished) ("[The officer's] exercise of physical force was only an

attempted seizure and therefore did not implicate the Fourth Amendment."). This is true even where, as here, a suspect continues to flee, despite officers' attempts to seize him through the use of deadly force. *See Brooks v. Gaenzle,* 614 F.3d 1213, 1224-25 (10th Cir.2010) (affirming district court's grant of summary judgment and conclusion that the defendants did not seize the plaintiff by shooting him as he fled); *accord Torres*, 769 F. App'x at 657 (holding that officers were entitled to qualified immunity because the plaintiff's continued flight after she was shot by police negated her Fourth Amendment excessive force claim).

**Lunsford Did Not Unlawfully Seize Plaintiff**

Plaintiff claims that Lunsford used excessive force when he shot Plaintiff as he was fleeing from Deputy Thouvenell. [Doc. 1-1, pp. 4-5].[7] However, Plaintiff did not submit to Lunsford's authority. As Plaintiff was fleeing from Deputy Thouvenell, Lunsford gave several commands to stop, which elicited no response from Plaintiff. [Doc. 33, p. 3]. After Plaintiff was struck by a bullet in the leg, he continued to flee, ultimately barricading himself in Ms. Gutierrez' residence, refusing to come out or submit to law enforcement officers on the scene. [*Id.*, p. 4]. Lunsford was relieved by another officer and did not participate in any subsequent attempts to apprehend or arrest Plaintiff. [Doc. 33, p. 4]. Plaintiff's protracted resistance came to an end sometime later, after he was extracted from the residence through the use of tear gas, a police dog, and the SWAT team. [Doc. 1-1, pp. 4-5; Doc 33, pp. 4-6].

Because Lunsford's attempt to seize Plaintiff was unsuccessful, and Plaintiff did not submit to Lunsford's assertion of authority, Lunsford did not seize Plaintiff and cannot therefore be liable for an unreasonable seizure by use of excessive force. *See Jones*, 809 F.3d at 575 ("[w]ithout a

---

[7] It is not disputed that Deputy Thouvenell and Lunsford were both firing at Plaintiff as he fled. [Doc. 1-1, pp. 4-5; Doc. 33. p. 4]. Defendants assert that it is not clear from which firearm the bullet that struck Plaintiff came. However, for purposes of this Motion only, Defendants assume that Plaintiff was struck by a bullet from Lunsford's firearm. [Doc. 33, p. 4, n.2].

seizure, there can be no claim for excessive use of force in effectuating that seizure." (citing *Lewis*, 523 U.S. at 843-44).

Moreover, considering the totality of the circumstances based on the evidence in the record, Lunsford's use of force was reasonable. *See Graham*, 490 U.S. at 396 ("[T]he test of reasonableness under the Fourth Amendment…requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.").

Lunsford was called to assist with the pursuit and arrest of Plaintiff, who had an outstanding warrant for criminal damage to property; contempt of court; battery against a family member, false imprisonment; and telephone threats/harassment. [Doc. 33-2]. After resisting arrest, including battering and disarming Deputy Thouvenell, Plaintiff fled on foot. [Doc. 1-1, pp. 4-5; Doc. 33-3, pp. 1-2]. Plaintiff actively resisted arrest by continuing to flee, ignoring Lunsford's commands to stop. [Doc. 33-3, p. 2]. Lunsford could not see whether Plaintiff was carrying anything in his left hand as he was running. [*Id.*]. Given the charges for which there was an outstanding warrant for Plaintiff's arrest, Deputy Thouvenell's statements that Plaintiff had battered an officer, Plaintiff's continued resistance, and Lunsford's inability to determine whether Plaintiff was armed, Lunsford could have reasonably concluded that Plaintiff posed an immediate threat to the safety of the other responding officers and the public. *See Henry v. Storey,* 658 F.3d 1235, 1239 (10th Cir. 2011) (recognizing that a criminal suspect has strong incentive to evade arrest and that any resulting chase could place other officers and the public at risk); *Clark v. Bowcutt*, 675 F. App'x 799, 806 (10th Cir. 2017) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the

officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.")); *Wilson v. Meeks,* 52 F.3d 1547, 1553 (10th Cir.1995) ("The inquiry is not into the assailant's state of mind or intentions, but whether, from an objective viewpoint and taking all factors into consideration, the officer reasonably feared for his life."); *Pride v. Does,* 997 F.2d 712, 717 (10th Cir.1993) (citing *Hunter v. Bryant,* 502 U.S. 224 (1991) ("The relevant question for the court is not whether plaintiff acted in a threatening manner but whether the officer reasonably believed so."). Accordingly, I am persuaded that Lunsford did not violate Plaintiff's Fourth Amendment rights and is therefore entitled to qualified immunity on Plaintiff's excessive force claim.

**False Arrest/False Imprisonment**

Plaintiff asserts, generally, that he was unlawfully arrested and detained pending his trial on the charges for which he was indicted. [Doc. 1-1, pp. 7, 10, 11]. The existence of probable cause precludes recovery for wrongful arrest under the Constitution, where such claims are based on the Fourth or Fourteenth Amendment. *J.H. ex rel. J.P. v. Bernalillo Cty.*, 806 F.3d 1255, 1260 (10th Cir. 2015). "Probable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be seized has committed or is about to commit a crime." *Manzanares v. Higdon,* 575 F.3d 1135, 1144 (10th Cir.2009) (internal quotation marks and citation omitted). "In the context of a qualified immunity defense on an unlawful search or arrest claim, [the Court must] ascertain whether a defendant violated clearly established law by asking whether there was arguable probable cause for the challenged conduct." *Stonecipher v. Valles,* 759 F.3d 1134, 1141 (10th Cir.2014). "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Id.* "A defendant is

entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff." *Id.* (internal quotation marks and citation omitted).

Substantively, the question of whether probable cause existed in light of the factual record does not require proof beyond reasonable doubt, or even a preponderance of the evidence. *See Kerns*, 663 F.3d at 1188. It does not even require the suspect's guilt to be "more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983); *see also U.S. v. Ludwig*, 641 F.3d 1243, 1252 (10th Cir. 2011). Instead, the relevant question is whether a "substantial probability" existed that the suspect committed the crime, *see Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir.1996), requiring something "more than a bare suspicion." *Ludwig*, 641 F.3d at 1252; *see also Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007) ("[p]robable cause only requires a probability of criminal activity, not a prima facie showing of such activity").

Where, as here, "an alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or in objective good faith." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks and citation omitted). Nonetheless, that fact does not end the inquiry into objective reasonableness. *Id.* The Supreme Court has recognized an exception allowing suit when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Id.* (internal quotation marks and citation omitted). The "shield of immunity otherwise conferred by the warrant will be lost, for example, where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* However, "[t]he threshold for establishing this exception is high." *Id.* "[I]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination" because "[i]t is the

magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Leon*, at 921, 104 S.Ct. 3405. P. 1245.

The present case does not fall within this narrow exception. In light of Ms. Gutierrez' statement as well as her apparent injuries and the damage to her vehicle which corroborated her statement, it would not be unreasonable for an officer to believe that there was probable cause to support the warrant. [Doc. 33-7, pp. 3-4]. Under the circumstances set forth in the warrant affidavit, an officer could reasonably conclude that there was a substantial probability that Plaintiff committed the crimes listed in the warrant, i.e., battery, aggravated battery, and false imprisonment.

Based on the totality of the circumstances, including the initial warrant for Plaintiff's arrest which was supported by probable cause, and Plaintiff's criminal conduct after Deputy Thouvenell attempted to execute the warrant, I conclude that probable cause existed for Plaintiff's July 12, 2014 arrest. *See e.g.*, *J.H. ex rel. J.P.*, 806 F.3d at 1258 (finding probable cause for an arrest after Sheriff's Deputy observed arrestee engaged in criminal conduct). Moreover, the record reflects, and Plaintiff does not dispute, that Lunsford was not involved in Plaintiff's ultimate arrest and detention. [Doc. 1-1, pp. 2-5; Doc. 33, p. 4]. For these reasons, I conclude that Lunsford did not violate Plaintiff's Fourth Amendment rights with respect to Plaintiff's arrest and detention, and is therefore entitled to qualified immunity on Plaintiff's false arrest/false imprisonment claim.

Plaintiff points to his acquittal on three of the nine of the crimes for which he was indicted as evidence that his original arrest was wrongful. That interpretation is foreclosed for two reasons. First, despite the referenced acquittals, Plaintiff was convicted on six of the crimes for which he was indicted. [Doc. 1-1, p. 7; Doc. 33-10, pp. 1-4; Doc. 33-11, pp. 1-5]. More to the point, probable

cause is determined by the circumstances confronting the arresting officer at the time of the arrest; the validity of an arrest "is not undermined by subsequent events in the suspect's criminal prosecution, such as dismissal of charges or acquittal." *Summers v. Utah*, 927 F.2d 1165, 1166-67 (10th Cir. 1991) (citations omitted); *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *Hubbert v. City of Moore*, 923 F.2d 769, 773 (10th Cir. 1991) ("[w]hether the jury eventually convicts the defendant of the crime has no bearing on the question whether the officer had probable cause to make the arrest").

**Malicious Prosecution**

A malicious prosecution claim brought under the Fourth Amendment requires a showing that "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Stonecipher*, 759 F.3d at 1146 (internal quotation marks and citation omitted). "Malice may be inferred if a defendant causes the prosecution without arguable probable cause." *Id.*

Notably, Lunsford was not involved in Plaintiff's arrest or subsequent detention. [Doc. 1-1, pp. 2-5; Doc. 33-3, p. 3]. However, even if Lunsford was somehow involved in Plaintiff's arrest or detention, as previously discussed, the evidence demonstrates that Plaintiff's arrest was supported by probable cause, and Plaintiff has not offered any other basis from which it can be inferred that Lunsford acted with malice. Because there is no evidence that Lunsford violated Plaintiff's Fourth Amendment rights with respect to Plaintiff's prosecution, I conclude that Lunsford is entitled to qualified immunity on Plaintiff's malicious prosecution claim.

**Failure to Provide Medical Care**

Eighth Amendment claims for denial of medical attention are cognizable where acts or omissions by the defendants are "sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). The right to custodial medical care is clearly established. *Id.* at 104. Although "[p]retrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, ... this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (internal quotation marks and citation omitted). "Deliberate indifference involves both an objective and a subjective component." *Id.* The objective component is met "if the deprivation is sufficiently serious—that is, if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotation marks and citation omitted). The subjective component is met "if an officer knows of and disregards an excessive risk to [a detainee's] health or safety." *Id.* (internal quotation marks and citation omitted). Essentially, the officer must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Garrett v. Stratman,* 254 F.3d 946, 949-50 (10th Cir.2001).

Here, the evidence does not support a finding that Lunsford was deliberately indifferent to Plaintiff's medical needs. As previously discussed, it is undisputed that Lunsford was not involved in Plaintiff's ultimate apprehension or detention, or any of the decisions made thereafter concerning Plaintiff's medical care. [Doc. 1-1, pp. 4-5; Doc. 33-3, p. 3]. Thus, Lunsford could not have observed or assessed the seriousness of Plaintiff's injuries; nor would he have had an opportunity to disregard any risk to Plaintiff's health or safety. [*Id.*].

**Plaintiff's Claims Against Montoya and Miyagishima**

**Supervisor Liability Under § 1983**

Supervisors are not liable under § 1983 unless there is "an affirmative link ... between the constitutional deprivation and either the supervisor's personal participation, ... exercise of control or direction, or ... failure to supervise." *Gallagher v. Shelton,* 587 F.3d 1063, 1069 (10th Cir.2009) (omission in original) (internal quotation marks and citation omitted). "Because supervisors can only be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a deliberate or conscious choice." *Dorato v. Smith*, 108 F. Supp. 3d 1064, 1109 (D.N.M. 2015) (internal quotation marks and citation omitted). *Cf. Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. at 404, 117 S.Ct. 1382 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)). Accordingly, the Tenth Circuit recognizes that "defendant-supervisors may be liable under § 1983 where an 'affirmative' link exists between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy ...—express or otherwise—showing their authorization or approval of such misconduct.'" *Dodds v. Richardson,* 614 F.3d at 1200–01 (quoting *Rizzo v. Goode,* 423 U.S. 362, 371 (1976)).

Here, Plaintiff argues that Montoya and Miyagishima, through direct and indirect commands and policies, rules, and regulations, authorized the use of excessive force by LCPD officers. [Doc. 1-1, pp. 7-10]. According to Plaintiff, the alleged use of excessive force caused him

to suffer ongoing physical and emotional injuries and to be unlawfully arrested and imprisoned. [Doc. 1-1, p. 8].[8]

Plaintiff does not identify any specific command, policy, procedure, or regulation given, adopted, or enforced by Montoya or Miyagishima that would constitute authorization or approval of the constitutional violations alleged. [Doc. 1-1, pp. 7-10]. Thus, Plaintiff has failed to demonstrate or even allege specific conduct by Montoya and Miyagishima upon which supervisory liability under § 1983 can be imposed. Moreover, because the record evidence does not show constitutional violations by LCPD officers, it is also void of evidence linking Montoya and Miyagishima to any such violations.

In sum, there are no evidentiary facts to support the alleged constitutional violations by Lunsford, Montoya, and Miyagishima. *See Jones*, 169 F.3d at 1291. Lunsford, Montoya, and Miyagishima are therefore entitled to qualified immunity on Plaintiff's claims of excessive force, false arrest/false imprisonment, malicious prosecution, and failure to provide medical care. I recommend that summary judgment be entered in favor of Lunsford, Montoya, and Miyagishima on those claims. *See Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018) ("If the plaintiff fails to satisfy either part of the two-part inquiry, a court *must* grant the defendant qualified immunity." (emphasis added)); *see e.g*., *Torres*, 769 F. App'x at 657 (affirming summary judgement where the plaintiff failed to satisfy the first prong of the qualified immunity inquiry); *Johnson v. City of Roswell*, 752 F. App'x 646, 652 (10th Cir. 2018) (affirming summary judgment on the plaintiff's excessive force claim where there was no constitutional violation, as officers were thus entitled to qualified immunity); *Lobozzo v. Colorado Dep't of Corr.*, 429 F. App'x 707,

---

[8] Plaintiff does not dispute that neither Montoya nor Miyagishima were present or directly involved in the events leading up to his July 12, 2014 arrest and subsequent detention. [Doc. 1-1, pp. 7-10].

713 (10th Cir. 2011) (affirming the district court's determination that the defendants were entitled to qualified immunity on the plaintiff's Eighth Amendment claim based the lack of evidence of a constitutional violation); *Amundsen v. Jones*, 533 F.3d 1192, 1200-01 (10th Cir. 2008) (reversing the denial of qualified immunity and summary judgment where the plaintiff failed to demonstrate constitutional violations).

Under 28 U.S.C. § 1367(c)(3) (2012), "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." The Tenth Circuit has counseled that federal district courts "should decline the exercise of jurisdiction by dismissing the case without prejudice" where all federal claims have been dismissed before trial. *Brooks*, 614 F.3d at 1229; *see also Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011). When the remaining causes of action are predicated entirely on state law, remand of the state law claims is proper.

This is a removed case. [*See* Doc. 1]. The Notice of Removal indicates that the only basis for subject matter jurisdiction in the federal courts is 28 U.S.C. § 1331 (1980), federal question jurisdiction. [Doc. 1]. Summary judgment and dismissal has been recommended on Plaintiff's federal claims. I recommend that the Court remand the claims under the NMTCA to the First Judicial District Court, County of Bernalillo, State of New Mexico. If , on the other hand, the Court agrees and remands the state law claims, Defendants' Second Motion for Summary Judgment may properly be resolved by the state tribunal. If the state claims remain within the jurisdiction of the federal court, I recommend that summary judgment for Defendants be granted for the reasons discussed below.

**Defendants' Second Motion for Summary Judgment**

In their Second Motion for Summary Judgment [Doc. 34], Defendants Lunsford, Montoya and Miyagishima address Plaintiff's state law claims under the NMTCA and the New Mexico Constitution.

**The Law Governing Plaintiff's New Mexico Tort Claims Act and State Constitutional Claims**

The NMTCA is the "exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act." N.M.S.A. § 41-4-17(A). The New Mexico Legislature enacted the NMTCA, because it recognized "the inherent unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity." N.M.S.A. § 41-4-2(A). At the same time, the New Mexico Legislature recognized "that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done." N.M.S.A. § 41-4-2(A). Accordingly, it is "the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act." N.M.S.A. § 41-4-2(A).

The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." N.M.S.A. § 41-4-2(C). Governmental entities and their employees and agents are immune from suit unless the cause of action fits within one of the exceptions set forth in the Act. *See Begay v. State*, 1985-NMCA-117, ¶ 10 ("Consent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act.").

"A plaintiff also may not sue a governmental entity or its employees for a damage claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity." *Lymon v. Aramark Corp.*, 728 F. Supp. 2d at 1251. *Accord Barreras v. State of N.M. Corr. Dep't*, 2003-NMCA-027, ¶ 24 ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act."); *Chavez v. City of Albuquerque*, 1998-NMCA-004, ¶ 8, (noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city or its employees or agents unless the NMTCA waives immunity); *Rubio v. Carlsbad Mun. Sch. Dist.*, 1987-NMCA-127, ¶ 11 (holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board); *Begay*, 1985-NMCA-117, ¶ 14 (finding that no waiver existed in NMTCA for suit for damages under Article II, § 11 of the New Mexico Constitution -- a provision that protects the "free exercise of religion").

Section 41-4-12 of the NMTCA provides that law enforcement officers' immunity is waived for:

> "liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties."

**Immunity is Not Waived Under the NMTCA for Alleged Conduct by Miyagishima**

While immunity is waived under the NMTCA for certain conduct of law enforcement officers acting within the scope of their duties, the scope of that waiver does not reach municipal mayors, such as Miyagishima, who was the Mayor of Las Cruces on July 12, 2014, when the

incidents instigating this case occurred. [Doc. 1-1, pp. 3-5; Doc. 34, pp. 16-17]. *See* § 41-4-12 (waiving immunity for enumerated conduct by law enforcement officers acting within the scope of their job duties); Section 41-4-3(D) (defining "law enforcement officer" as "a full-time salaried public employee of a governmental entity, or a certified part-time salaried police officer employed by a governmental entity, whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor.").

Plaintiff does not point to any other immunity waiver within the NMTCA that would apply to the claims he brings against Miyagishima and none appears under Sections 41-4-4 to -12 which set forth the NMTCA's waivers of immunity. For that reason, as well as others discussed below, I recommend that the NMTCA claims brought against Miyagishima be dismissed.

**Plaintiff's Particular State Law Claims**

**Excessive Force/Assault & Battery**

Under New Mexico law, "[f]or there to be an assault, there must have been an act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery." *Fuerschbach*, 439 F.3d at 1208 (internal quotation marks and citation omitted). "Battery occurs when an individual acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and an offensive contact with the person of the other directly or indirectly results." *Id.* at 1208-09 (ellipsis and internal quotation marks omitted).

In the performance of their duties, however, police officers are entitled "to use such force as [i]s reasonably necessary under all the circumstances of the case." *Mead v. O'Connor*, 1959-NMSC-077, ¶ 4. Thus, "[w]hen acting in good faith, the courts will afford them the utmost

protection, and they will recognize the fact that emergencies arise when the officer cannot be expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigations in court." *Id.* This presents an "objective standard of police conduct." *State v. Ellis*, 2008-NMSC-032, ¶ 22, n.2. Fourth Amendment jurisprudence is a guide through this inquiry. *Id.* For the reasons discussed above regarding his excessive-force claim under § 1983, I conclude that Lunsford's use of force was objectively reasonable, and accordingly, no reasonable jury could return a verdict in Plaintiff's favor for assault or battery under New Mexico law.[9]

**False Arrest/False Imprisonment and Malicious Prosecution/Malicious Abuse of Process**

**Plaintiff's False Arrest/False Imprisonment and Malicious Prosecution Claims are Untimely**

Plaintiff's state law claims are governed exclusively by the NMTCA and its two-year statute of limitations. *See* §§ 41-4-15(A) and 41-4-17(A) ("[t]he Tort Claims Act . . . shall be the exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act"); *Sam v. Sam*, 2006-NMSC-022, ¶ 23 ("The New Mexico Tort Claims Act expresses a clear public policy that tort claims against negligent New Mexico governmental entities should be allowed, but only if brought within two years of the date of the alleged tort."). The NMTCA limitations period begins to run when a plaintiff knows or with reasonable diligence should have known of the injury and its cause, even if the claimant is not aware of the full extent of the injury. *See Maestas v. Zager*, 2007-NMSC-003, ¶ 22.

---

[9] To the extent Plaintiff brought an excessive-force claim under the New Mexico Constitution's prohibition against unreasonable seizures, *see* N.M. Const., art. II, § 10, he does not differentiate such a claim from his Fourth Amendment excessive-force claim. Both claims employ "a reasonableness standard," *Sisneros v. Fisher*, 685 F.Supp.2d 1188, 1222 (D. N.M. 2010), and Plaintiff identifies no basis for the Court to decide his state constitutional claim differently from his federal constitutional claim.

**False Arrest/False Imprisonment**

"No New Mexico court has addressed when false arrest or false imprisonment claims accrue, or when the statute of limitations begins to run." *Gose v. Bd. of Cty. Comm'rs of Cty. of McKinley*, 727 F. Supp. 2d 1256, 1263-64 (D.N.M. 2010). Absent New Mexico precedent addressing this issue, the Court must determine, under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), how the Supreme Court of New Mexico would rule. *Id.* (citing *Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 901 (10th Cir.2005)). In so doing, the Court "may consider all resources available, including decisions of New Mexico courts and the general trend of authority." *Id.* (citing *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1228 (10th Cir.2001)).

Under New Mexico law, "[a] false arrest is merely one way of committing false imprisonment." *Santillo v. N.M. Dep't of Pub. Safety*, 2007-NMCA-159, ¶ 12. *Accord Wallace v. Kato*, 549 U.S. at 388–89 (2007) (recognizing that "[f]alse arrest and false imprisonment overlap; the former is a species of the latter."). While the Court need not decide, on this motion, whether New Mexico claims for false arrest and for false imprisonment are the same tort, it appears that the Supreme Court of New Mexico would find that claims for false arrest and false imprisonment accrue at the same time.

The New Mexico Supreme Court likely would look to the Restatement (Second) of Torts in making such a determination. *See Schmitz v. Smentowski*, 1990-NMSC-002, ¶ 49 (recognizing that New Mexico courts have been "very willing to adopt the view of the Restatement of Torts [(Second)] to assist [its] development of new tort areas.").

The Restatement (Second) of Torts provides that "[f]or false imprisonment, the statute [of limitations] begins to run only when the imprisonment ends, since the period of imprisonment is treated as a unit." Restatement (Second) of Torts § 899, cmt. c. The Restatement also appears to

treat the tort of false arrest as the same tort or as a subset of the tort of false imprisonment. *See* Restatement (Second) of Torts § 654 ("If there is nothing more than the false arrest and the accused is released without any further proceeding, his remedy is an action for false imprisonment."); Restatement (Second) of Torts Index at 530 ("False Arrest: See False Imprisonment").

As this Court has previously noted, the Restatement's approach is consistent with New Mexico tort jurisprudence. *Gose*, 727 F. Supp. 2d at 1264. According to the Supreme Court of New Mexico, "[t]he plain language of [§ 41-4-15A] indicates that the period of limitations began to run when an 'occurrence resulting in loss' took place." *Aragon & McCoy v. Albuquerque National Bank*, 1983-NMSC-020, ¶ 17. Specifically, statute of limitations commences when an "injury manifests itself and is ascertainable, rather than when the wrongful or negligent act occurs." *Maestas v. Zager*, 2007-NMSC-003, ¶ 13. (internal quotation marks and citation omitted). *See Saiz v. Belen Sch. Dist.*, 1992-NMSC-018, ¶ 41, n. 12 (noting that "a statute of limitations begins to run when a plaintiff's cause of action accrues or is discovered"). "Under New Mexico law, 'false imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so.'" *Romero v. Sanchez*, 1995-NMSC-025, ¶ 13 (quoting NMSA 1978, § 30-4-3). False arrest or unlawful detention occurs when the "facts available to [a] detaining officer would [not] warrant [a] person of reasonable caution to believe detention appropriate." *Romero*, 1995-NMSC-025, ¶ 13 ("Unlawful detention has similar requirements" to false imprisonment).

The approach I believe the New Mexico Supreme Court would take is also consistent with that taken by the United States Supreme Court. In *Wallace v. Kato*, the Supreme Court of the United States addressed the timeliness of a 42 U.S.C. § 1983 claim for an unlawful arrest. *See* 549 U.S. 384, 386 (2007). The Court noted that "[a]spects of § 1983 which are not governed by

reference to state law are governed by federal rules conforming in general to common-law tort principles." *Id.* at 388. With respect to the accrual of common-law false arrest and false imprisonment claims, the Court concluded that "[f]alse arrest and false imprisonment overlap; the former is a species of the latter ..." and that the Court would "refer to the two torts together as false imprisonment." *Id.* at 389. The Court explained that "[t]he sort of unlawful detention remediable by the tort of false imprisonment is detention without legal process," and that "[l]imitations begin to run against an action for false imprisonment when the alleged false imprisonment ends." *Id.* "Reflective of the fact that false imprisonment consists of detention without legal process, false imprisonment ends once the victim becomes held pursuant to such process—when, for example, he is bound over by a magistrate or arraigned on charges." *Id.* In a footnote, the Court noted: "This is not to say, of course, that petitioner could not have filed suit immediately upon his false arrest. While the statute of limitations did not begin to run until petitioner became detained pursuant to legal process, he was injured and suffered damages at the moment of his arrest, and was entitled to bring suit at that time." *Id.* at 390 n. 3.

I conclude that Plaintiff possibly could have filed suit immediately upon his arrest, but that the statute of limitations did not begin to run until his imprisonment ended or he was detained pursuant to legal process for trial. *See id.*

In this case, Plaintiff was arrested on July 12, 2014. [Doc. 1-1, pp. 3-5; Doc. 33-6, pp. 1-5]. He was indicted on the charges relative to that arrest on August 8, 2014 [Doc. 33-9], at which point he was held pursuant to legal process and the alleged false imprisonment ended that sate. *See Wallace*, 549 U.S. at 389. Therefore, the statute of limitations on Plaintiff's false arrest/false imprisonment claim began to run August 8, 2014 and the two-year limitations period expired on August 8, 2016. Plaintiff filed his Complaint in this case on August 9, 2017. [Doc. 1]. I recognize

that Plaintiff signed his Complaint on July 11, 2014 and it was filed by the state court clerk on August 9, 2014. Using either of two dates, Plaintiff's Complaint was filed approximately one year after the limitations period expired.

For these reasons I conclude that Plaintiff's false arrest/false imprisonment claim under the NMTCA was not timely filed.

### Malicious Prosecution

This Court has recognized that a malicious prosecution/malicious abuse of process claim under the NMTCA accrues, for limitations purposes, immediately upon the improper use of process. [Doc. 18 (citing *Mata v. Anderson*, 685 F.Supp.2d 1223, 1254-55 (D.N.M. 2010))]. In *Mata*, the Court held that a plaintiff knows or has reason to know of the facts substantiating a malicious prosecution claim on the day the criminal complaint is filed. *See* 685 F.Supp.2d at 1253. Here, the criminal complaint against Plaintiff was filed on July 18, 2014 and Plaintiff was indicted on August 13, 2014. [Doc. 33-6, pp. 3-5]. Thus, the two-year limitations period under the NMTCA for Plaintiff's malicious prosecution/malicious abuse of process claim expired on August 13, 2016 at the latest. Because Plaintiff's Complaint in this action is dated July 11, 2017 and was filed on August 9, 2017 [Doc. 1-1, pp. 13], I conclude that Plaintiff's malicious prosecution/malicious abuse of process claim under the NMTCA is time-barred.

### Plaintiff's False Arrest/False Imprisonment and Malicious Prosecution Claims Under the NMTCA Fail Because Probable Cause Existed for His Arrest and for the Filing of the Criminal Complaint

Under New Mexico law, claims for false arrest/false imprisonment and malicious prosecution (or malicious abuse of process) involve the common element of probable cause. *See Benavidez v. Shutiva*, 2015-NMCA-065, ¶ 12 ("When probable cause is present, a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the

necessary authority to carry out the arrest." (internal quotation marks and citation omitted)); *id.* ¶ 20 ("An improper use of process may be shown by (1) filing a complaint without probable cause, or (2) an irregularity or impropriety suggesting extortion, delay, or harassment, or other conduct formerly actionable under the tort of abuse of process.") (internal quotation marks, and citation omitted)).

In this context, "probable cause [i]s the reasonable belief, founded on known facts established after a reasonable pre-filing investigation, that a claim can be established to the satisfaction of a court or jury." *DeVaney v. Thriftway Mktg. Corp.,* 1998-NMSC-001, ¶ 22 (internal quotation marks and citations omitted). For the reasons discussed above regarding Plaintiff's § 1983 false arrest/false imprisonment and malicious prosecution claims, probable cause existed for Plaintiff's arrest. Moreover, Plaintiff has not alleged, and the record does not reflect any "irregularity or impropriety suggesting extortion, delay, or harassment, or other conduct" as would support a malicious prosecution claim under New Mexico law. [See Doc. 1-1, pp. 3-5].

Consequently, I conclude that no reasonable jury could return a verdict in Plaintiff's favor on his state law claims for false arrest/false imprisonment and malicious prosecution.[10]

**Failure to Provide Medical Care**

Plaintiff has not identified a specific waiver of immunity under the NMTCA under which his state law claim for failure to provide medical care is brought. [*See* Doc. 1-1, pp. 3-5]. However, it appears that any such claim is brought under Section 41-4-9, which waives immunity "for

---

[10] To the extent Plaintiff brought false arrest/false imprisonment and malicious prosecution claims under the the the New Mexico Constitution, *see* N.M. Const., art. II, §§ 10, 18, he does differentiate those claims from his federal false arrest/false imprisonment and malicious prosecution claims. Both the federal and state law claims involve a "probable cause" requirement. *See Stonecipher*, 759 F.3d at 1146; *J.H. ex rel. J.P.*, 806 F.3d at 1260; *Benavidez*, 2015-NMCA-065, ¶ 20, and Plaintiff identifies no basis for the Court to decide his state constitutional claims in this regard differently from his federal constitutional claims.

damages resulting from bodily injury…caused by the negligence of public employees while acting within the scope of their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities." Section 41-4-9.

None of the remaining defendants in this case are within the limited scope of public employees identified by the waiver in § 41-4-9. There are no evidentiary facts to support Plaintiff's contention that he was denied medical attention by Lunsford or the LCPD and consequently, no reasonable jury could return a verdict in Plaintiff's favor on his state law claim for failure to provide medical care.

**Vicarious Liability Claims Against Montoya and Miyagishima**

To the extent that Plaintiff asserts vicarious liability or *respondeat superior* claims against Montoya and Miyagishima under the NMTCA, those claims are not supported by the record evidence in this case. Vicarious liability holds "one person, although entirely innocent of any wrongdoing and without regard to duty…responsible for harm caused by the wrongful act of another." *Saiz*, 1992-NMSC-018, ¶ 31.

Under the NMTCA, a supervisor may be held liable for the acts of a public employee where (1) the employee is subject to a waiver of immunity as set forth in Sections 41-4-5 to -12 and (2) the supervisor or entity has immediate supervisory responsibilities over the employee. *See Abalos v. Bernalillo Cnty. Dist. Atty's Office*, 1987-NMCA-026, ¶ 23. As discussed above, there are no questions of material fact as to the constitutional violations alleged as the basis for Plaintiff's NMTCA claims. Consequently, there are no factual questions as to whether vicarious liability can be imposed on Montoya and Miyagishima. *See Baker v. Hedstrom*, 2013-NMSC-043, ¶ 31 ("[T]he

exoneration of the servant removes the foundation upon which to impute negligence to the master." (alteration in original) (internal quotation marks and citation omitted)).[11]

**Plaintiff's Memorandum in Support of Plaintiff's Civil Action**

On July 1, 2019, Plaintiff filed a *Memorandum in Support of Plaintiff's Civil Action*. [Doc. 49]. This filing appears to recount the arguments in opposition to summary judgment made in his previous untimely filings discussed above. In this regard, Plaintiff's Memorandum is a subsequent surresponse filed without leave of the Court and should be disregarded. *Tellez-Giron*, No. 1:17-CV-01074, 2018 WL 611361, at *4 (recognizing that courts typically permit supplemental pleadings such a surresponse or surreply "where the reply presents new arguments or new evidence."); *see Black*, 900 F.2d at 116; *Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 2012 WL 1132527, at *15 (D.N.M. 2012).

Within his Memorandum, Plaintiff states that he is "entitled to prevail as a matter of law" and that "summary judgment is requested in accourdence [sic] to Fed.R.Civ.P. 56(a)." [Doc. 49, p. 4]. However, Plaintiff provides no argument or evidence to support this request. To the extent that Plaintiff intends to move for summary judgment, I note that Plaintiff's July 1, 2019, memorandum does not carry his burden on summary judgment. *See Adler*, 144 F.3d at 670-71 (recognizing that the summary judgment movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law). For this reason, and for the reasons outlined above, I conclude that Plaintiff has not demonstrated that he is entitled to summary judgment on any of his claims.

---

[11] In this Court's May 7, 2018 Memorandum Opinion and Order it dismissed the § 1983 claims against the LCPD. It appears that the LCPD was then inadvertently terminated as a party to this action, despite possible remaining NMTCA claims against it. However, as there is no basis to impose individual liability on Lunsford under the NMTCA, there is likewise no basis to impose vicarious liability on LCPD relative to Plaintiff's NMTCA claims.

**Defendants' Motion to Stay Proceedings Pending Resolution of Motion for Summary Judgment Based Upon Qualified Immunity [Doc. 35] and Plaintiff's Motion for Pretrial Conference and Telephonic Hearings; Scheduling Order and Case Management [Doc. 28]**

Because disposition of this case on summary judgment is recommended, it is also recommended that *Defendants' Motion to Stay Proceedings Pending Resolution of Motion for Summary Judgment Based Upon Qualified Immunity* [Doc. 35] and *Plaintiff's Motion for Pretrial Conference and Telephonic Hearings; Scheduling Order and Case Management* [Doc. 28] be denied as moot.

**CONCLUSION**

For the foregoing reasons, it is recommended that:

*Plaintiff's Motion for Pretrial Conference and Telephonic Hearings; Scheduling Order and Case Management* filed on December 21, 2018 [Doc. 28] be DENIED;

*Defendants' First Motion for Summary Judgment Based Upon Heck v. Humphrey and Qualified Immunity*, filed on January 15, 2019 [Doc. 33] be GRANTED;

*Defendants' Second Motion for Summary Judgment on Plaintiff's Claims Under State Law*, filed on January 15, 2019 [Doc. 34] be GRANTED;

*Defendants' Motion to Stay Proceedings Pending Resolution of Motion for Summary Judgment Based Upon Qualified Immunity,* filed on January 15, 2019 [Doc. 35] be DENIED; and

*Defendants' Motion to Strike Plaintiff's Surreply*, filed on April 29, 2019 [Doc. 45] be GRANTED.

It is further recommended that Plaintiff's claims against Montoya and Barela be dismissed.

_____
JERRY H. RITTER
U.S. MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).

**A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**